**2026 UT App 98**

## THE UTAH COURT OF APPEALS

STEPHEN EDWARD SCHMIDT,
Appellant,

*v.*

ANGELA SCHMIDT,
Appellee.

Opinion
No. 20240759-CA
Filed July 2, 2026

Third District Court, Silver Summit Department
The Honorable Richard E. Mrazik
Commissioner Kim M. Luhn
No. 184500202

Julie J. Nelson, Attorney for Appellant

Aaron R. Harris, Lacee M. Whimpey, and
Kipp S. Muir, Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and AMY J. OLIVER concurred.

HARRIS, Judge:

¶1     In a stipulation resolving their divorce case, Stephen Edward Schmidt agreed to make Angela Schmidt's monthly mortgage payments, subject to certain conditions. Stephen believed that one of those conditions was that Angela would remain in the same house, or at least in the same area.[1] Based on that belief, he stopped making the payments after discovering that Angela had moved to a different county. Angela filed a

---

1. Because the parties share the same last name, we follow our usual practice of referring to them by first names, with no disrespect intended by the apparent informality.

motion to enforce the terms of the divorce decree, asking the court to order Stephen to resume those payments and pay arrearages. A domestic relations commissioner ruled in favor of Stephen, but upon objection, the district court ruled in favor of Angela. In the court's view, the language of the relevant provision unambiguously provided that Stephen had to continue making Angela's mortgage payments, even if she moved to a different county. Stephen now appeals that ruling, arguing that the provision is at least ambiguous on the relevant issues. We agree with Stephen, and we therefore reverse the court's order and remand this case for further proceedings, including potentially an evidentiary hearing at which the court should consider extrinsic evidence of the parties' intent.

## BACKGROUND

¶2    Stephen and Angela divorced at the end of 2018 after seventeen years of marriage. During their marriage, the parties had three children together, all of whom were minors at the time of the parties' divorce. Stephen and Angela were able to resolve the issues in their divorce case through a stipulated settlement (the Original Stipulation).

¶3    The Original Stipulation—which was later accepted by the court and incorporated into the parties' decree of divorce—included terms regarding the parties' children. Stephen and Angela agreed to "share joint legal and joint physical custody" of the children, but they designated Angela's house as the children's "primary residence." As to "[r]elocation" of the children, the parties stipulated to the following provision (Provision 10):

> For the purpose of promoting the [children's] best interests and general welfare and facilitating the parties' joint physical custody of the [children], the parties' expressly agree that the [children's]

residence may not be moved more than 20 miles (as measured by Google Maps on paved roadways passable year-round) away from the Park City School District (the Region) for any reason or under any circumstance(s), for so long as either party maintains a full-time residence within the Region and absent a written agreement between the parties.

The parties agreed to certain remedies if either was to violate Provision 10. Specifically, they agreed that the non-breaching "party shall be entitled to obtain from the [c]ourt . . . any and all equitable and legal relief necessary to enforce the foregoing prohibition, including (without limitation) a temporary restraining order, a preliminary injunction, a permanent injunction, . . . [and] any and all injunctive relief necessary to bring the breaching party into compliance with the terms" of the Original Stipulation. And further, the parties "agreed and acknowledged that relocating the [children] outside of the Region is contrary to their best interest."

¶4　　The Original Stipulation also included child and spousal support terms. Stephen agreed to pay a base amount of $10,000 per month in child support, which decreased as each of the children reached the age of majority "and graduate[d] from high school with [their] normal and expected class." He also agreed to pay alimony to Angela in the amount of $40,000 per month, which similarly decreased over time, ending in 2033 or "in the event [she] remarries or cohabitates."

¶5　　The parties also agreed to specific provisions regarding property division. In this regard, the Original Stipulation referred to each relevant piece of real property by address, name, and the amount "due and owing" on any mortgages associated with each property. And when describing different accounts to be divided, the Original Stipulation identified each account by name, value, and account number.

¶6     The Original Stipulation also included a "[m]odification" provision, which stated that "[n]o change or [modification] of the terms of [the Original Stipulation] shall be effective, unless and until confirmed in writing, executed by both parties, making specific reference to [the Original Stipulation]."

¶7     About a year and a half later, Stephen and Angela agreed to modify the Original Stipulation. In a document reflecting the agreed-upon changes (the Modification), the parties specified that the document merely modified—but did not supplant—the Original Stipulation and that all provisions of the Original Stipulation that were "not specifically modified" were to "remain in full force and effect." The provision in the Modification that is most relevant here is the second one (Provision 2), a provision categorized by the parties as an "additional property settlement term[]," which stated as follows:

> [Stephen] will pay [Angela's] mortgage payment of approximately $7,000.00 per month which includes property taxes and insurance beginning January 1, 2021, directly to [Angela's] lender (Chase Bank or subsequent lender) on or before the first day of every month until the parties' [youngest child] graduates from high school with her normal and expected class. [Angela] will keep [Stephen] informed of the address, loan number and additional information necessary to accomplish the payment.

¶8     At the time of the Modification, Angela owned a house in Park City on Ledger Way (the Ledger Way House), which was located within the Park City School District. But a little over a year after the parties signed the Modification, Angela sold the Ledger Way House, moved to a different house, and asked Stephen to start making the mortgage payments on her new house. Angela's new house was located in Sandy, Utah (the Sandy House), which

is in a different county more than twenty miles away from the Park City School District and therefore outside "the Region" discussed in the Original Stipulation. Stephen refused to pay Angela's mortgage on the Sandy House.

¶9     In response to Stephen's refusal to pay her new mortgage, Angela filed a motion to enforce. After holding a hearing on that motion, a domestic relations commissioner issued a recommended ruling in favor of Stephen, offering her view that, under the unambiguous terms of Provision 2 of the Modification, Stephen was required to pay only the mortgage payments on the Ledger Way House and that if Angela moved from that house, Stephen was no longer obligated to make her payments.

¶10    Angela objected to the commissioner's recommendation, and the court held a hearing to consider Angela's objection. During that hearing, neither party contended that Provision 2 was ambiguous; instead, each party claimed that Provision 2 could be unambiguously interpreted in his or her favor.

¶11    After considering the parties' arguments, the court ruled in favor of Angela and sustained her objection to the commissioner's recommendation. It agreed with the commissioner that Provision 2 was "unambiguous as a matter of law." But contrary to the commissioner, the court concluded that Provision 2 unambiguously compelled a result in Angela's favor and not the other way around; the court considered Stephen's interpretation to be "not plausible." In the court's view, "the plain language of [P]rovision 2 does not include any language that makes the provision specific to any piece of real property." And it determined that "the use of the word 'approximately $7,000' and the requirement that Stephen make payments directly to the mortgage lender show[ed] an unambiguous intent that Stephen be obligated to pay the mortgage payment not to exceed approximately $7,000 . . . of the property Angela holds." The court interpreted Provision 2 to be an agreement for "Stephen to

provide an economic benefit to Angela." And in the court's view, "the issue of where the children reside [was] irrelevant" to the interpretation of Provision 2. Accordingly, the court ordered Stephen to make the mortgage payments on the Sandy House, in the amount of $5,173 per month, plus arrearages. And it ordered Stephen to pay Angela's attorney fees incurred in litigating the motion to enforce.

## ISSUE AND STANDARD OF REVIEW

¶12 Stephen now appeals the district court's order interpreting Provision 2 in Angela's favor. In particular, he challenges the court's determination that Provision 2—construed alongside and in harmony with the other provisions of the Original Stipulation and the Modification—can be *unambiguously* interpreted in Angela's favor. A district court's determination that a contract is unambiguous—as well as its follow-on interpretation of that putatively unambiguous contract—constitutes a legal determination that we review for correctness. *See WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 ("Whether an ambiguity exists in a contract is a question of law." (cleaned up)); *Regal RealSource LLC v. Enlaw LLC*, 2024 UT App 95, ¶ 20, 554 P.3d 1112 ("If the plain language of the contract is clear and unambiguous, then the contract may be interpreted as a matter of law, without resort to parol evidence." (cleaned up)), *cert. denied*, 558 P.3d 89 (Utah 2024).

## ANALYSIS

¶13 In this appeal, we must assess whether the district court correctly determined that the relevant contractual provisions are unambiguous. After all, if that determination is incorrect and the contract is actually ambiguous, then the contract cannot be interpreted as a matter of law, and reversal of the district court's

order would be required so that the court, on remand, could consider extrinsic evidence regarding the parties' true intent. For the reasons discussed, we conclude that the relevant contractual provisions are in fact ambiguous because both parties' proffered interpretations are reasonable ones.[2]

¶14    When interpreting a contract, "the overriding principle is that the intentions of the parties are controlling." *Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 21, 474 P.3d 481 (cleaned up); *see also Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 ("When interpreting a contract, our task is to ascertain the parties' intent."). "[T]he best indication of the parties' intent is the ordinary meaning of the contract's terms."

---

2. As a threshold matter, Angela contends that Stephen failed to preserve for appellate review the question of whether the contractual provisions are ambiguous. Angela points out that, before the district court, each party argued—while nevertheless advocating for very different contractual interpretations—that the relevant provisions of the Original Stipulation and the Modification could be unambiguously interpreted in his or her favor. But in this situation, the question of whether the contract is (or is not) ambiguous is preserved for appellate review, almost by definition, because in order to assess the parties' arguments, the district court had to evaluate the reasonableness of each party's proffered interpretation. *See Vierig v. Therriault*, 2023 UT App 67, ¶¶ 42–54, 532 P.3d 568; *see also Ocean 18 LLC v. Overage Refund Specialists LLC* (*In re Excess Proceeds from Foreclosure of 1107 Snowberry St.*), 2020 UT App 54, ¶ 25, 474 P.3d 481 ("If both sides advance interpretations of [a contract] that are plausible and reasonably supported by the document's language, then the document is ambiguous, even if neither party actually uses that label to describe the document."). We therefore reject Angela's preservation argument.

*Mind & Motion*, 2016 UT 6, ¶ 24. Thus, we begin our analysis, in this context, with an examination of the plain language of the contract, construed as a whole. *See Regal RealSource LLC v. Enlaw LLC*, 2024 UT App 95, ¶ 20, 554 P.3d 1112 ("Courts . . . begin their interpretive analysis by looking to the language of the contract, and in doing so they examine the entire contract and all of its parts in relation to each other." (cleaned up)), *cert. denied*, 558 P.3d 89 (Utah 2024); *see also Ocean 18*, 2020 UT App 54, ¶ 21 ("We examine the entire contract and all of its parts in relation to each other and give a reasonable construction of the contract as a whole to determine the parties' intent." (cleaned up)).

¶15   "In many cases, we need look no further than the plain language of the contract, because that language may unambiguously tell us what the parties intended." *Ocean 18*, 2020 UT App 54, ¶ 22. Indeed, where "the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *Mind & Motion*, 2016 UT 6, ¶ 24 (cleaned up). In these situations, there is no need for affidavits or an evidentiary hearing, and the court may proceed to interpret the contract based on its language alone.

¶16   "But in other instances—those in which the contractual language is facially ambiguous—a court will not be able to tell, simply from an examination of the contract's plain language, what the parties intended." *Ocean 18*, 2020 UT App 54, ¶ 22. In those situations, parties should be given the opportunity to submit parol evidence—in the form of things like affidavits, documentary evidence, or testimony—about what they intended the ambiguous language to mean. *See Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 (stating that, when a "contract is facially ambiguous, parol evidence of the parties' intentions should be admitted" to assist the court in assessing the parties' intentions (cleaned up)); *see also Central Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599 ("If the language within the four corners

of the contract is ambiguous, . . . extrinsic evidence must be looked to in order to determine the intentions of the parties.").

¶17    Thus, an important question courts must answer, early in any contractual-interpretation exercise, is whether the contract is ambiguous on the relevant point. And this question is a legal one, not a factual one, and is "to be determined by the judge." *See Daines*, 2008 UT 51, ¶ 25; *see also WebBank v. American Gen. Annuity Service Corp.*, 2002 UT 88, ¶ 22, 54 P.3d 1139 ("Whether an ambiguity exists in a contract is a question of law." (cleaned up)).

¶18    To determine whether a contract is ambiguous, an examining court must assess the strength—or reasonableness—of each interpretation proffered by the parties. If there is only one reasonable interpretation of the contract, then it is not ambiguous. But if there are multiple (or zero) reasonable interpretations of a contract, then it is ambiguous, and an examination of extrinsic evidence is necessary in order to ascertain the parties' intent. *See Mind & Motion*, 2016 UT 6, ¶ 24 ("A contract is facially ambiguous if its terms are capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." (cleaned up)); *Equine Holdings LLC v. Auburn Woods LLC*, 2021 UT App 14, ¶ 27, 482 P.3d 880 (stating that contractual ambiguity exists "where *neither* proffered interpretation" is reasonable).

¶19    The key to the inquiry, then, is the assessment of whether each proffered interpretation can be considered reasonable. And on that score, Utah appellate courts have consistently held that "a reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended." *Brady v. Park*, 2019 UT 16, ¶ 55, 445 P.3d 395. Crucially, "a contract provision is not necessarily ambiguous just because one party gives that provision a different meaning than another party does." *Plateau Mining Co.*

*v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990); *see also Brady*, 2019 UT 16, ¶ 55 n.44 ("We will conclude that the parties could reasonably have intended both of the competing interpretations only if each interpretation is based upon the usual and natural meaning of the language used and is not the result of a forced or strained construction when considered in context of the contract as a whole." (cleaned up)). To be considered reasonable, "the contrary positions of the parties must each be tenable." *Plateau Mining Co.*, 802 P.2d at 725.

¶20    In *Brady*, Justice Lee pushed back against this definition, offering his view that if both interpretations are reasonable but one is better than the other, then that better interpretation should win out and there should be no need to look at extrinsic evidence to determine the parties' intent. *See* 2019 UT 16, ¶ 136 (Lee, J., concurring in part and dissenting in part) ("I would say that we look to extrinsic evidence only as a sort of 'tie-breaker'—to resolve very close calls on the best interpretation of the four corners of a written contract."). But this position didn't carry the day in *Brady*. In response to Justice Lee, the majority made clear that when determining reasonableness, the question is not simply whether one interpretation is somewhat better than the other. *See id.* ¶ 55 n.42 (majority opinion) ("Although we have frequently explained what it means for a contract interpretation to be reasonable, we have never applied the standard Justice Lee proposes in his dissent." (cleaned up)). Rather, the correct inquiry is whether each interpretation is plausible enough to be over the reasonableness bar such that it "cannot be ruled out." *Id.* ¶ 55. If both parties' interpretations are over this bar, then the contractual language is ambiguous, even if the court thinks that one of the interpretations might be somewhat better than the other.

¶21    With these legal principles in mind, we now turn to an examination of the various contractual interpretations advanced here by Stephen and Angela. We discern three:

- Stephen's interpretation that Provision 2 obligates him to pay Angela's mortgage payments only if she stays in the Ledger Way House;

- Stephen's alternative interpretation that Provision 2 obligates him to pay Angela's mortgage payments only if she remains in a residence inside the Region; and

- Angela's interpretation that Provision 2 requires Stephen to pay her mortgage payments even if she moves outside the Region.

As we explain, we consider all three of these interpretations to be reasonable under the definition supplied by *Brady* because, "after considering the natural meaning of the words in the contract provision in context of the contract as a whole," we think each of these interpretations is one "the parties could have reasonably intended." *See id.*

¶22    First, Provision 2 could reasonably be intended to mean that Stephen must pay Angela's mortgage payment only if she remained in the Ledger Way House. Stephen asserts that the term "mortgage payment" in Provision 2 "is tied to a specific piece of real property"—the Ledger Way House. And there is potential support for this position within the text of Provision 2. For instance, no language in Provision 2 expressly states that Stephen remains obligated to pay Angela's mortgage if she moves away from the Ledger Way House. Moreover, the payment is to be "approximately $7,000," which could be construed to refer to a particular mortgage payment on a particular piece of property. And the provision refers specifically to "[Angela's] lender," another reference that could reasonably be construed to be referring to a specific lender and a specific mortgage payment. In addition, as Stephen points out, the term "mortgage" is often used

to refer to an encumbrance on a specific piece of property. To be sure, the text of the provision does appear to contemplate that the identity of the "lender" might change and that the precise amount of the payment might change, but these events can occur without the mortgagor ever moving out of the house in question. On balance, we think Stephen's proffered interpretation is sufficiently supported by the text of Provision 2 to render it reasonable under the *Brady* definition.[3]

¶23     Second, Provision 2—construed in tandem with Provision 10—can also be reasonably interpreted to mean that Stephen is compelled to pay Angela's mortgage payment, up to approximately $7,000, only as long as she remains within the Region. The chief support for this interpretation is Provision 2's sunset provision, which obligates Stephen to make the payment—assuming the other requirements are met—until the parties' youngest child "graduates from high school with her normal and expected class." Stephen links this language to Provision 10 in the Original Stipulation, in which the parties agreed that the children's residence "may not be moved" outside the Region. We agree with Stephen that our task is to interpret the contractual documents together, as one harmonious whole, and therefore consideration of Provision 10 is entirely appropriate when interpreting Provision 2. *See id.* After all, the two documents are part of the same contract, and the Modification specified that it was leaving the unmodified parts of the Original Stipulation intact. *See Arlington Mgmt. Assocs., Inc. v. Urology Clinic of Utah Valley, LLC*, 2021 UT App 72, ¶ 19, 496 P.3d 719 ("A modification

---

3. It is also noteworthy that the domestic relations commissioner found this particular interpretation not only reasonable but actually unambiguously correct. We take Stephen's point that, if two different judicial officers each adopt a different "unambiguous" interpretation of a document, that is a good sign that the document might be ambiguous.

can affect the provisions which were discussed as part of the modification, but not the provisions which were ignored." (cleaned up)).

¶24 And when we read Provision 2 together with Provision 10, the text of those provisions indicates that the parties could reasonably have intended that Stephen be obligated to pay Angela's mortgage payment only if she stayed inside the Region. Provision 10 reflected the parties' agreement that it was in the children's best interest that they remain inside the Region. And Provision 2 explicitly references the youngest child's graduation as the timeframe for Stephen's obligation, so it is a reasonable inference that the parties' intent, in obligating Stephen to pay Angela's mortgage payment, was to ensure that the children could live inside the Region—in keeping with the parties' understanding of the children's best interest—until they graduate from high school. While we acknowledge that the text is nowhere near clear on the point, Stephen's alternative interpretation is sufficiently supported by the text of the provision to elevate it above the reasonableness bar.

¶25 Finally, we also consider Angela's interpretation to be reasonable. In her view, Provision 2 compels Stephen to pay her mortgage—up to "approximately $7,000"—no matter where she resides and even if she relocates outside the Region. This interpretation is sufficiently supported by pieces of the contractual text to qualify as reasonable. For instance, nothing in Provision 2 expressly ties the term "mortgage payment" to the Ledger Way House or to any specific house. And Angela points out that the parties knew how to negotiate for property-specific provisions; after all, in other provisions of the Original Stipulation, relevant real property was often referred to by address, name, and the amount "due and owing" on the mortgages associated with each. Indeed, the text of Provision 2 appears to support Angela's assertion that Stephen's obligation was not tied to any specific mortgage, given that Provision 2

spoke of "subsequent lender[s]" and obligated Angela to keep Stephen apprised of any changes in "the address"[4] or the "loan number" of the mortgage. Accordingly, Angela's interpretation is one that cannot be ruled out as one the parties could have reasonably intended.

¶26    Thus, in our view all three of the proffered interpretations are sufficiently supported in the language of the Original Stipulation and the Modification to be reasonable interpretations that the parties could have intended. The relevant contractual provisions are therefore ambiguous, and their meaning should not have been determined as a matter of law before consideration of extrinsic evidence.

CONCLUSION

¶27    We reverse the district court's order declaring the contractual provisions to be unambiguous and interpreting them as a matter of law in Angela's favor, and we remand this case for reassessment of the contractual-interpretation question in light of our determination that Provision 2 is ambiguous. In particular, the district court, on remand, should allow the parties to submit extrinsic evidence of their intent regarding Provision 2. Evaluation of this evidence, and "resolution of the question of the parties' intentions regarding an ambiguous contract" after consideration of that evidence, "is usually reserved for the factfinder" after an evidentiary hearing or trial. *See Ocean 18*, 2020 UT App 54, ¶ 29. On remand, the district court will need to hold an evidentiary hearing to evaluate the parties' submitted extrinsic

---

4. Even the term "address" is potentially ambiguous, as it is not entirely clear whether that term is intended to refer to the address of the mortgagor or the address of the mortgage servicing entity to whom the money is to be sent.

evidence, unless that evidence "is so one-sided that a reasonable factfinder could reach but one conclusion" about it. *Id.*[5]

———————

5. The district court awarded Angela attorney fees as the prevailing party under the terms of the Modification. She also now requests attorney fees on appeal. But "we have determined that the district court's ruling was . . . erroneous, and therefore deem it necessary to vacate that court's 'prevailing party' determination as well as its award of attorney fees to [Angela]." *See Vanderwood v. Woodward*, 2019 UT App 140, ¶ 49, 449 P.3d 983. Accordingly, "[a]t the conclusion of the proceedings on remand, the district court should reassess the 'prevailing party' issue and award attorney fees as appropriate at that time." *Id.*